### SANDFORD v. EMBRY.

(Circuit Court of Appeals, Sixth Circuit. March 21, 1907.)

No. 1,613.

1. PARTNERSHIP—SETTLEMENT AGREEMENT—CONSTRUCTION.

A settlement of the accounts of a partnership engaged in the operation of a boat involved, among other things, accounts for the construction of the boat, various items of expenditure not evidenced by receipts, accounts for materials and supplies, etc. The settlement agreement provided that, in consideration of the sum of $537.33, being one-fourth of the expenses of operating the boat, it was agreed to readjust the accounts when the parties should meet in Mexico, and correct any error found therein, by the one paying to the other whatever amount, if any there might have been, improperly paid or allowed in settlement. *Held,* that such provision should be construed to refer only to the claims for expenditure on account of operating expenses, and that a settlement of accounts made and signed, but subject to correction, must stand as a settlement until error is affirmatively shown, and the burden is on the party seeking to open it.

151 F.—62

2. REFERENCE—MASTER'S REPORT—EXCEPTIONS.

An exception to a master's report is defective, where it fails to point out the specific error relied on.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reference, §§ 157–161.]

3. SAME—EFFECT OF REPORT.

Where a reference was by consent of the parties, and directed the master to report his conclusions of fact and law to the court, the findings of the master will be treated as prima facie correct, and only such matters of law and fact as were brought before the court by exception will be reviewed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Reference, §§ 150–153, 157–161.]

4. PARTNERSHIP—ACCOUNTING—BURDEN OF PROOF.

On a partnership accounting of the ownership and operation of a boat, the burden was on the partner having charge of the bookkeeper and his books to produce the same in order to show the amount that should be allowed for operating expenses.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Partnership, § 779.]

5. INTERNAL REVENUE—STAMP TAXES—DUTY TO AFFIX STAMP.

Where a citizen of the United States executed a bill of sale of his interest in a boat plying on a Mexican river, which was required to be stamped under the Mexican internal revenue laws, the buyer was not entitled to claim that the instrument was invalid because not stamped, since he was entitled to himself affix the stamp and look to the seller for reimbursement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 29, Intoxicating Liquors, §§ 87–93.]

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is a bill to reopen a settlement of a partnership for the construction and operation of a small steamboat upon one of the rivers of Mexico, and to have an accounting between the parties of the expenditures and receipts in the construction and operation of same. After completing and running the boat for a few months she snagged and sank while complainant was, by the agreement, in sole charge and management. In this condition the complainant agreed to buy the defendant's interest, which was a three-fourths, and pay for the same four-fifths of the cost of construction. This being then unknown with certainty was to be ascertained. Complainant also sold to defendant a small farm in Ohio near Cincinnati, if the value could be agreed upon. This tentative sale was made in Mexico, one McClymonds acting for defendant Embry, who was all the time in Cincinnati. This contract bore date of September 5, 1897. Leaving the boat on the bottom of the river, the complainant came to Cincinnati to complete the purchase. On November 4th such a settlement was had between the parties as resulted in the conveyance by Sandford of his farm to Embry, in consideration of $6,000 and the assumption of several mortgages thereon, and a bill of sale by Embry to Sandford of his three-fourths interest in the sunken boat at a valuation of that interest stated at $3,634.82. The liability of Sandford to Embry on account of his proportion of original cost not paid by him and of his proportion of the claim of Embry for disbursements on account of the operating expenses of the boat was also adjusted. The boat has never been raised and is a total loss, and this, complainant claims, is due to the interference of defendant and his agent and his inability to obtain possession in consequence, and because the bill of sale was not stamped as required by the law of Mexico to entitle it to registration. Complainant also claims that the settlement of November 4th was only experimental and subject to correction, and that defendant agreed to meet him in Mexico and there go over the accounts and readjust the same, but did not do so. He therefore asks to have their tentative settlements overhauled, and

his contract of sale and purchase avoided and for general relief. The defendant denied all the equities of the bill, and set up and relied upon the settlements as full and fair. By way of cross-bill, he averred that he, when said settlement was made, loaned to complainant $1,500 and took a chattel mortgage upon the steamer so sold to him and prayed for a decree in his favor. The court below referred the issue to a special master who reported for the defendant upon all matters of fact in dispute. Exceptions were overruled, the bill dismissed, and a decree granted upon the cross-bill for the money loaned the complainant. Complainant has appealed and assigned error.

F. P. Bradstreet and E. H. Williams, for appellant.

Harry L. Gordon, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

Upon the application of both parties, the court below appointed a special master and referred the case to him "for trial upon all points at issue upon the pleadings and as the ends of justice may require." This special master was directed to take evidence "and inquire into and report upon all questions properly at issue herein between the parties and to state an account between them and determine and report to this court the testimony which he may take and also his conclusions upon all the issues joined and the amount, if anything, which the complainant is entitled to recover against the defendant or vice versa."

1. The primary question of fact is whether any settlement of the tangled affairs of this partnership has ever been made, and, if so, whether any such state of facts was shown as to require that it should be utterly set aside and an accounting ordered as if no such settlement had been ever made. The master reported that such a settlement of the accounts between the parties was made on November 4, 1897. The exception to this is in such uncertain terms as to make it doubtful whether the complainant means to challenge the general fact of such a settlement, or merely to question its conclusiveness. On September 5, 1897, McClymonds, acting for complainant and defendant, made a tentative agreement by which complainant, hereinafter designated as Sandford, was to buy the interest of the defendant, Embry, in the steamer Esperanza. Embry was then at his residence in Ohio. The steamer was lying on the bottom of the Mexican river, and this agreement was made in Mexico. The agreement was in these words:

"Articles of Agreement.

"On this, the fifth day of September, A. D., 1897, the following agreement is made and entered into by and between J. H. McClymonds, Jr., general manager of the Esperanza Plantation and Navigation Co., party of the first part, and J. H. Sandford, party of the second part.

"Article First. Upon the payment of the sum of four thousand and five hundred ($4,500) dollars, U. S. currency, to Talton Embry of Cincinnati, Ohio, president of the above-mentioned company, by J. H. Sandford, party of the second part, all right, title and interest in three-fourths (¾) part of the steamer La Esperanza and its appurtenances will be resigned in favor of the said J. H. Sandford.

"Article Second. In the absence of accounts upon which to base estimates the supposed cost of said steamer is taken at seven thousand and five hundred ($7,500) dollars, U. S. currency. Supposing, however, its cost to have been

either more or less than sum stated, the payment made shall in that case be of like ratio, or as 6,000 is to 7,500.

"Article Third. All outstanding accounts due or against said steamer, contracted before the date of this agreement, shall be assumed by the party of the first part.

"Article Fourth. The stock of merchandise now owned by said steamer is to be retained by the party of the first part, and is not included in this agreement.

"Article Fifth. Party of the first part hereby agrees to favor the interests of, and to lend his influence to party of the second part in the operation of his boat, and to in no case patronize a competing line. All things being equal or reasonably near thereto.

"Article Sixth. This contract or agreement is to be of no value unless satisfactory figures on the property owned by the party of the second part, and located in California, Ohio, can be arrived at between the said Talton Embry and J. H. Sandford, party of the second part.

"Article Seventh. After date of this contract the party of the first part is relieved of all responsibility in connection with said boat. It being assumed by party of the second part.

"[Signed]                                    J. H. McClymonds, Jr.
                                             "J. H. Sandford.

"Wm. Sullivan.
"J. A. Peterson."

It is inferable from the terms of this agreement that the cost of construction of the boat was not then known, and that the estimated cost was to be settled thereafter; second, that the price to be paid was in the ratio of 6,000 to 7,500, that is, Sandford was to pay Embry for his three-fourths interest four-fifths of the cost of that three-fourths interest. The original agreement of partnership provided that Embry was to own three fourths and Sandford the remaining fourth, and that each should contribute to the cost of construction in that proportion and share profits and losses in same ratio. It is also inferable from the agreement, as well as from the other evidence, that the purchase by Sandford was conditioned upon Embry buying a small farm in Ohio owned by Sandford, and that the value of this farm in the trade was a subject for future agreement. Neither does that agreement take any account of the profits and losses incurred in the operation of the boat, nor of the capital paid in by either for construction or operating purposes. The accounts by which the cost of the steamer could be ascertained definitely were, evidently, not then available, for the agreement states that this was so. Sandford from the date of that agreement assumed the sole responsibility for the boat, for the seventh clause specifically so provides. Sandford did accordingly take sole and entire possession, placing in charge of the sunken boat one Sullivan as his representative. Sandford then left for Cincinnati to see Embry and conclude the conditional purchase. The undisputed evidence is that he and Embry agreed upon the value of the farm, and Embry agreed to take the place at $6,000 and assume certain mortgages against it. Thus there remained to be adjusted: (a) The cost of the construction of the boat; (b) the amount which each had contributed thereto; and (c) the income and expenditures in operating the boat.

The evidence shows that there were frequent meetings to adjust these matters and very many accounts and receipts were produced, some by one and some by the other party. No regular books were exhibited

and none seem to have been accessible. The original partnership agreement provided that Sandford should keep the books and accounts, and report all receipts and expenditures once a month. The contention of the complainant before the master and in his bill seems to have been that he had no books of accounts; that all such books of accounts were in the possession of Embry, or his agent, McClymonds; and that without the examination of books and accounts in Mexico there could be no settlement. The master upon this point reports that the books kept were in charge of and kept by one Hunter, the clerk of the boat, employed by Sandford upon the recommendation of McClymonds. He reports that when the boat sank no effort is shown to have been made by Sandford to take care of these books. The agreement of September 5th indicates that Hunter's books, presumably then accessible, were not such as to enable the parties to make any settlement as to the cost of the boat, for it recites that "in the absence of accounts on which to base estimates" an ascertainment of the cost is to be made thereafter. To do this Sandford came to Cincinnati, and did not bring with him the books which it was his duty to keep, or any books or papers, beyond a few receipted accounts for materials and supplies bought and paid for by him. There is no explanation as to what became of the books kept by Hunter, nor was he produced as a witness, neither party seeming to know anything of his whereabouts. It thereafter happened that the settlement which the parties tried to make had to be made from four kinds of data: (a) Accounts for materials and supplies rendered to and paid by Embry. Most of them were approved by Sandford. (b) Accounts made by and paid by Sandford. (c) Accounts rendered to Embry by McClymonds for moneys paid out by him as agent for Embry, either for construction purposes or in subsequent operation of the boat. (d) A few items of expenditures by one or other not evidenced by receipts and dependent upon memory.

With this data and the assistance of counsel for each, the parties endeavored to find out how they stood. The negotiations extended over a number of days. On November 4th they culminated, not in any full receipting as one might reasonably expect, but by the execution of certain documents from which a final settlement is inferred by one side and denied by the other. These documents are:

(a) A bill of sale for Embry's interest in the steamer Esperanza, the agreed price paid by Sandford being there stated as $3,634.82. As by article second of the agreement of September 5th Sandford was to pay only four-fifths of the cost of a three-fourths interest, it is evident by calculation that the gross original cost of the boat was found to be $6,058.04 and not $7,500, as estimated September 5th. This agreement as to the cost of the boat, as shown by the evidence, especially by that of Mr. Harry L. Gordon, was reached by carefully going through the accounts filed as exhibits in the record, and was definitely and finally accepted by both parties.

(b) Under the agreement of partnership, Sandford should have paid one-fourth of this cost of construction. He had paid very little, nearly all the bills being paid by Embry. The parties agreed, according to the weight of evidence before the master, that Sandford owed Embry on

this account $1,514.51 less $215 the amount paid by Sandford, being $1,299.51.

(c) These agreements left open the question of what one owed the other on account of moneys paid out on account of the operation of the boat. The evidence shows that many items claimed by Embry to belong to the construction account were objected to as not being properly a part of that account. One of the largest of these items was for moneys paid out for a stock of merchandise furnished the boat with which to conduct a mercantile business on board the boat. McClymonds, as agent for Embry, bought this stock for Embry's Mexican plantation, but Sandford wanted the goods, and he turned the purchase over to the boat and charged it up in his account as money paid out for the boat by Embry. The major part of the claims of Embry against the partnership for moneys paid out on account of operating expenses was shown by an account, itemized, which ran to Nichols & McClymonds, the representatives of Embry in the management of his affairs in Mexico, and while many of these items were disputed and a few eliminated, yet the evidence preponderates in favor of the contention that the items finally admitted to the account for moneys paid out for operating expenses were so admitted by consent of Sandford. One-fourth of this claim was $573.33, and it is in connection with this part of the accounts between these people that the contention has been most strongly made that the settlement of November 4th was not intended to be final. This is in part supported by an agreement of that date in these words:

"In consideration of the allowance by J. H. Sandford in the settlement this day made between said Sandford and Talton Embry, in accordance with the agreements made on October 20, 1896, September 5, 1897, and October 19, 1897, of the sum of $573.33, being one-fourth of the expenses of operating the boat La Esperanza, as shown by statements in possession of Mr. Embry, it is hereby agreed to readjust said accounts when the said parties shall meet at Coatzacoalcos, Mexico, and to correct any error that is found, by the one paying to the other whatever amount, if any, that may have been improperly paid or allowed in said settlement."

The weight of evidence leads us to conclude that this agreement to "readjust said accounts" refers only to this claim of expenditures on account of operating expenses. But assume that it extends to the cost of construction as well, it is plain that the settlement as made must stand until it is shown that error has crept into it, and the burden is plainly upon the complainant to do this. But a settlement subject to correction is none the less a settlement, and the master's report that there was such a settlement is unimpeached by the provision for the correction of errors.

2. Under the terms of the agreement of November 4, 1897, it was open to either side to show error in the settlement then made. The master finds that the evidence did not show any specific error in the settlement which would justify a correction. The exceptions filed by the complainant to this report do not point out any single item which was omitted or excluded in this settlement. The exception is to the report that the evidence did not justify any change in the settlements without specifying any particular correction. In the cases styled the Columbus, etc., Ry. Appeals, 109 Fed. 180, 219, 48 C. C. A. 275, 317, we said:

"Exceptions to a master's report must point out specifically the errors upon which the party relies. The object of such definiteness is to give the master an opportunity to see wherein his report is subject to objection and to apprise the opposite party of just what he has to meet."

This is an elementary rule of equity procedure. Otherwise the parties may compel the examination of the entire case again, although the object of a reference to a master is to lighten the work of the trial judge by narrowing any controversy to be brought up on exceptions to such alleged errors as the objecting party specifically points out. Sheffield, etc., Ry. Co. v. Gordon, 151 U. S. 285, 14 Sup. Ct. 343, 38 L. Ed. 164. Aside from the vagueness of the exceptions, there was a more insuperable difficulty in going behind this report in the weight to be attached to a master's finding of fact under a special reference such as was made in this case. This reference was by consent of the parties, and directed the master to report his conclusions upon fact and law to the court. A distinction is observed between a reference by the court not by consent, and a reference with consent, when the master is directed to report not only the evidence but also his conclusions upon the evidence. When the reference is not by consent it is largely advisory to the chancellor, though it is said in Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 32 L. Ed. 764, that the practice is to accept the report unless definite exceptions point out plain error. Medsker v. Bonebrake, 108 U. S. 66, 72, 2 Sup. Ct. 351, 27 L. Ed. 654, where the reference was by the court and not by consent, it was said:

"The findings of the master are prima facie correct. Only such matters of the law and fact as are brought before the court by exceptions are to be considered, and the burden of sustaining the exceptions is on the objecting party."

See, also, Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664, and Columbus R. Appeals, 109 Fed. 180, 219, 48 C. C. A. 275.

But in Kimberly v. Arms, cited above, and in the later case of Davis v. Schwartz, 155 U. S. 631, 636, 15 Sup. Ct. 237, 39 L. Ed. 289, the reference was by consent. In the first mentioned case, where the opinion was by Justice Field, it was said:

"It is not within the general province of a master to pass upon all the issues in an equity case, nor is it competent for the court to refer the entire decision of a case to him without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty upon any of its officers. But when parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference by the consent of parties of an entire case for the determination of all its issues, though not strictly a submission of the controversy to arbitration—a proceeding which is governed by special rules—is a submission of the controversy to a tribunal of the parties' own selection to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct,

subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise."

And in Davis v. Schwartz it was said:

"As the case was referred by the court to a master to report, not the evidence merely, but the facts of the case, and his conclusions of law thereon, we think that his finding so far as it involves questions of fact is attended by a presumption of correctness similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. St. § 649 [U. S. Comp. St. 1901, p. 525], or in an admiralty cause appealed to this court. In neither of these cases is the finding absolutely conclusive, as if there be no testimony to support it; but so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable."

An examination of the entire evidence submitted to the master satisfies us that no error was committed in respect to the original cost of the boat's construction. We are not so sure about the claim for operating expenses, of which one-fourth was allowed Embry as a claim against Sandford. There is no satisfactory explanation as to the disposition made of the current receipts of the boat. Hunter has not testified, nor have his books been exhibited, nor their absence explained with any clearness. McClymonds testifies that he did not get these receipts from Hunter. Sandford testifies that he did not. We confess to a suspicion that some part of these receipts went to meet operating expenses and in payment of merchandise bought for the mercantile branch of the business, which has been credited as payments by Embry, through McClymonds. But as Sandford was in charge of Hunter and his books, the burden was on him to show this. His general statements in respect to the earnings of the boat and opinion about average expense is not so convincing as to justify us in going behind the master's conclusion that no specific errors had been shown in the settlement, even if we would be justified in doing so in the absence of exceptions placing a finger upon the specific things which had been wrongly credited in that branch of the account to Embry or omitted in the charging part thereof.

3. The claim that Sandford was excluded from the possession of the boat by McClymonds, when he returned to Mexico with the purpose of raising it, or that his care taker, Sullivan, had been discharged by McClymonds, leaving the boat subject to plunder and deeper injury by the elements, is not supported, and we see no reason for doubting the correctness of the master's report upon these points.

4. The fact that the bill of sale was not stamped has no merit in it. The master reports that it was the duty of the party desiring to use or prove a document executed in another country to himself affix the necessary stamps is a question of fact, and there is no reason in the record for disturbing the master's finding. But in any event Sandford might have properly stamped the instrument and looked to Embry for reimbursement. Certainly he had no justification in coming away on the pretense that Embry had failed to put him in possession of the

boat upon matters of this kind. The profound mistake of Sandford and the prime cause of the total loss which seems to have resulted to him is due largely to his long delay in reaching the sunken boat, and then his abandonment of it upon an assumed inability to take possession which had no solid foundation.

5. The claim that Embry prevented him from securing financial aid from certain friends who had partially promised to join him in raising and operating the boat is not based upon any ground, in law, sufficient to make Embry liable for his disappointment.

6. The decree upon the defendant's cross-bill was for money borrowed from Embry on November 4, 1897, to enable him to raise the boat and operate it. There was no error in that regard. The result is that the decree of the Circuit Court must be affirmed.