FLEITMANN et al. v. JOHN M. STONE COTTON MILLS.

(Circuit Court of Appeals, Fifth Circuit.   April 4, 1911.)

No. 2,088.

1. CORPORATIONS (§ 447*)—CAPACITY TO MAKE CONTRACTS.
      In the absence of any provision in the statute or its charter prohibiting it, a contract by a manufacturing corporation to give its exclusive selling agency to a commission firm in consideration of its buying stock of the corporation, and to repurchase the stock on the termination of the agency, is not ultra vires.
      [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1786, 1788, 1807; Dec. Dig. § 447.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CORPORATIONS (§ 406*)—REPRESENTATION BY OFFICERS—AUTHORITY TO MAKE CONTRACTS.

A contract signed by a corporation by its president was binding on the corporation, where its by-laws provided that the president should "make all contracts for the company."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1611–1614; Dec. Dig. § 406.*]

3. CORPORATIONS (§ 82*)—CONTRACTS—VALIDITY.

A manager of one of the departments of plaintiffs, who were commission merchants in New York, while on a trip South, had a talk with the directors of defendant corporation which was about to build a cotton mill, and made them a written proposition in his own name to take a certain amount of stock of the corporation, to be paid for when the mill was completed and in operation, conditioned that he should be the sole selling agent for the product. It was understood that he made the proposal in behalf of plaintiffs, but that he had no authority to conclude a contract. On his return he induced plaintiffs to write a letter to defendant making a similar proposition. No answer was made to the letter, but several months later plaintiffs wrote again, inclosing a contract for execution embodying the same proposition, and containing a provision that defendant should have the right to terminate the agency on notice and by repurchasing plaintiffs' stock. The contract was seen and discussed by at least three of defendant's directors and officers, and was afterward signed and returned by the president with the request that plaintiffs remit for the stock, which they did. The agency agreement was carried out satisfactorily for two or three years, when it was repudiated by defendant, which refused to make further consignments to plaintiffs. *Held*, that the contract was valid and bound defendant to repurchase plaintiffs' stock as a condition to a termination of the contract; the prior proposal, which omitted such provision, not having been accepted.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 82.*]

Shelby, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Mississippi.

Bill by F. T. Fleitmann and others composing the firm of Fleitmann & Co. against the John M. Stone Cotton Mills. Decree for defendant, and plaintiffs appeal. Reversed.

Marcellus Green and Garner W. Green (Rounds, Schurman & Dwight, Arthur C. Rounds, and Charles W. Atwater, of counsel), for appellants.

C. H. Alexander, Chalmers Alexander, Charlton A. Alexander (Carroll & Magruder, of counsel), for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This is an appeal from a decree of the Circuit Court of the United States for the Eastern Division of the Northern District of Mississippi, entered the 7th day of April, 1910, dismissing the original bill of appellants (complainants below), and granting the relief sought in the cross-bill of the appellee (respondent below), and adjudging that the respondent recover of the complainants $2,531.05, with interest from April 1, 1905.

The appellants compose the firm of Fleitmann & Co., commission merchants, citizens of the state of New York, residing and doing busi-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

ness in New York City. The appellee is a corporation of the state of Mississippi, which hereafter in this opinion we will designate as the "Cotton Mills," a citizen and resident thereof, operating a mill for the manufacture of cotton cloth at Starkville, Miss. The bill alleges, in substance: That for the purpose of enlarging its commission business the complainants (appellants) on April 28, 1902, made a proposition in the form of a letter to the respondent (appellee), whereby the complainants were to take stock in respondents' corporation, and become its exclusive selling agents. That the proposition was understood to contemplate a more precise definition. This proposition was not then accepted. Thereafter, on September 18, 1902, the complainants submitted to the respondent a proposed agreement in more detail, set out at length. This agreement was duly executed by both parties, and in reliance upon it the complainants paid $15,000 for 150 shares of capital stock of the respondent. Under this contract, the selling agency continued down to about April, 1905. At that time the respondent purported to repudiate the agreement, and refused to make further consignments of its goods to complainants, thus terminating the agency, but refusing to repay the $15,000 and receive a surrender of the shares of stock, as required by the contract. That the complainants fully performed all conditions of the contract on their part, except that after and because of the breach by the respondents they retained $2,531.05, which, otherwise, would have been remitted in April, 1905. The complainants further allege that they held the certificate for said stock and the money retained subject to the decree of the court; that, whether said contract be valid or invalid, it would be grossly inequitable to allow the respondents to retain the $15,000 paid thereunder, and they prayed that it be decreed that said sum be repaid with interest, less the $2,531.05, with interest from April 8, 1905, the date of its receipt. The answer to the bill sets forth that the letter of April 28th was a confirmation of a definite agreement previously made by an authorized agent of the complainants, and that thereafter the complainants acted as and were treated as stockholders; that the contract of September 18th was entered into by Arthur Whittam, president of the respondent, without authority, through fraud and collusion with the complainants; that Whittam withheld all knowledge of the contract from the directors for over a year; that it was accidentally discovered; and was repudiated on March 30, 1905, as ultra vires, without consideration, unauthorized, and void. The answer admits the refusal to consign goods to the complainants, and alleges the refusal to pay for goods consigned constituted a breach of the terms of agency on the complainants' part; that it was on the faith of the unconditional subscription of the complainants that the mill was built; that the $15,000 was paid under negotiations, partly verbal, culminating in the letter of April 28, 1902; that bondholders have protested against payment of $15,000 to the complainants; that at the time repayment was demanded the respondent was in danger of insolvency, and that complainants have no right to retain the $2,531.05, and prays that bill be dismissed. The replication to the answer alleges the answer to be insufficient, and denies all material allegations therein. The cross-

bill prays for payment of the $2,531.05 by Fleitmann & Co. to the Mills. The answer to the cross-bill denies all the allegations of improper conduct on the part of Fleitmann & Co. as agents, and other material allegations in the cross-bill, and alleges that the said $2,531.05 is claimed on account of the greater indebtedness claimed in the bill to be due from the Mills to Fleitmann & Co. All the testimony was taken by deposition de bene esse. In the case of the witnesses called by the respondent, counsel agreed that all objections to competency and relevancy of evidence were considered as reserved and properly taken.

One of the branches of the business of Fleitmann & Co. was to act as selling agents of cotton mills. This they did through various "departments," one of which in 1902 was the firm of Dickson & Hanna, who had their own salesrooms apart from the place of business of Fleitmann & Co. Mr. Hanna in the spring of 1902, before the respondent had commenced building its mill, was traveling in the South, apparently on his own affairs, and the testimony does not show that he was sent by or corresponding with Fleitmann & Co., but tends to show the contrary. He arranged with Mr. Whittam, who was then acting president of the respondent, for a meeting of the board of directors of the Mills, which took place on April 16, 1902. At this meeting Mr. Hanna proposed that his "house" should become stockholders and selling agents of the Mills. After the meeting, on request of some of the directors, he reduced his proposition to letter form, and signed it "Dickson & Hanna." Mr. Whittam, the president of respondent, was with Mr. Hanna when this letter was written, and asked that the letter provide for his presidency of the mill. Mr. Whittam also at the same time said that a letter from Fleitmann & Co. would be preferable. A minute of the action of the board of directors was made by the secretary in these words:

"At a meeting of the board to-day only two members were absent, Scales and Ervin. According to agreement Mr. Hanna was present and made an interesting talk and answered verbal questions. Mr. Hanna stated that his house would take fifteen thousand dollars in stock, provided they were made selling agents, and subscriptions to be paid when mill was completed. He also stated that the mill would not be bound in any way to them, but that they were to have a preference as long as they gave satisfaction."

The letter form into which Mr. Hanna reduced his interesting talk, was in these words:

"People's Savings Bank.
"W. W. Scales, President.
"M. F. Ames, Vice President.
"A. C. Ervin. Cashier.
"C. E. Gay, Asst. Cashier.
    "Starkville, Miss.

                                    "Starkville, Miss., April 16, 1902.

"Mr. Arthur Whittam, Prest. Pro Tem.  The John M. Stone Cotton Mills,
    Starkville, Mississippi.

"Dear Sir:  We hereby agree to take up to fifteen thousand dollars stock in your proposed mill, with the understanding that you are to place as much of this stock with your own people as you possibly can, thus relieving us from taking the full amount unless necessary.

"It is also understood that you are to be president of this enterprise and that we are to act as your selling agents, disposing of your product. This proposition is submitted with the understanding that you now have, as stated, eighty-five thousand dollars already subscribed, and that we are not to make any payments on subscriptions until the mill is built, equipped and in operation.

"Yours very truly, Dickson & Hanna. Dept. Fleitmann & Co."

In reference to this letter, the witness Walter W. Scales, Jr., testified: That the meeting which Mr. Hanna addressed was held in the directors' room of the People's Savings Bank, and the witness remembers distinctly that Mr. Hanna, Mr. Whittam, and himself went into the office of the bank for the purpose of writing up this contract of agreement, and "it was suggested that I do the writing, as I had at one time used that particular typewriter, but owing to the fact that I was at that time using a different typewriter—a different keyboard—and Mr. Hanna seemed to be rushed for time to make connections with the I. C. train, they urged me at too great a speed, and I was unable to write the document to their satisfaction, having made two distinct attempts."

On this point the witness John M. Hanna testifies as follows:

"XQ. After you had the conversation spoken of in your direct examination, with the board of directors of the John M. Stone Cotton Mills, you wrote a letter dated April 16th, 1902, a copy of which is marked 'Whittam Exhibit No. 1,' did you not? A. Yes, sir; I did not write the letter. It was written at my dictation.

"XQ. How long after the conversation between you and the board of directors was it that this letter, 'Whittam Exhibit No. 1,' was written by your dictation and signed by you? A. Three or four, four or five hours, something like that.

"XQ. State whether this letter, 'Whittam Exhibit No. 1,' signed 'Dickson & Hanna,' was the letter you wrote to Mr. Arthur Whittam at his request? A. Yes, sir; at the request of Mr. Scales, Jr. The directors also asked me to confirm the proposition which was made to them.

"XQ. I understood you on your direct examination to say that you made an effort to write a letter, but that the machine would not work and that it was abandoned. Was that correct? A. Well, we made an effort to write two different letters and the letter was so blurred that I think I could identify it, though I do not know. After two ineffectual attempts to get a clean copy of the letter, I got a facsimile of them. I wished to take one to New York to Fleitmann & Co.

"XQ. Did you not on that occasion tell the directors that any proposition that was suggested by you would have to be confirmed by Fleitmann & Co.? A. I do not remember telling the directors that, but I think I made such a statement to Mr. Scales and to Mr. Whittam.

"XQ. That was after the meeting was it? A. Yes.

"XQ. You had no authority then in your conversation to do more than make suggestions as to what you would recommend to Fleitmann & Co. to be done by them? A. I had the authority to come here to make a proposition to the John M. Stone Cotton Mills, but I had no authority to sign their names for confirmation.

"XQ. You had no authority to sign a subscription to the capital stock for Fleitmann & Co., did you? A. No, sir.

"XQ. Was not your relations to Fleitmann & Co. evidenced by a written contract between you and Fleitmann & Co.? A. It was."

The board of directors met again April 24th, and took action in the matter, as shown in the following excerpt from the deposition of Mr. W. W. Magruder:

"Q. I notice in the minute book of the John M. Stone Cotton Mills, page 13, dated April 24, 1902, the following language is used in these minutes: 'Then the proposition from Mr. Hanna was read and discussed, and objection was raised to one clause of the proposition, and Mr. Whittam stated he would have said clause erased.' Please examine that statement in the minutes, and explain it as best you can.  A. The section to which you refer reads as follows: 'Then the proposition from Mr. Hanna was read and discussed and objection was raised to one clause of the proposition and Mr. Whittam stated he would have said clause erased.'  I was the director who made the objection mentioned, and the objection was to that clause in the Dickson & Hanna letter, dated April 16, 1902, which provided that Mr. Arthur Whittam should be president of the mill.  This letter in question appears as Exhibit No. 1 to Mr. Whittam's deposition."

Bearing on the same point is the testimony of Mr. A. C. Ervin:

"XQ. You were asked as to the meeting of the directors on April 24, 1902. Will you kindly turn to the meeting of that date and read into the record what is said there in regard to the employment of Mr. Christopher?  A. 'Moved by Mr. Page that Mr. Christopher be employed at nine hundred dollars to superintend the building of the mill.  Seconded by Mr. Montgomery. Mr. Magruder moved that the motion be amended.  That the contract be signed as soon as a satisfactory reply was received from Fleitmann & Co. Amendment lost and original motion carried.'

"XQ. What did this resolution mean by satisfactory reply from Fleitmann & Co?  A. I judge it was in regard to the $15,000 as to whether or not they would take that stock.

"XQ. Then according to your recollection of April 24th, when this meeting of directors was had, the question of Fleitmann's taking the stock was a question as to whether the board got a satisfactory reply from Fleitmann & Co.?  A. Well, I do not know what letter that refers to.  What was the date of the letter we had?  And that was April 24th.  I suppose that was the letter we were waiting for.  We felt that we could not commence building and equipping the mill, unless we got the amount of $15,000 in addition to what we had at home.

"XQ. Then on April 24, 1902, the board of directors did not think that the subscription of Fleitmann to the stock was closed, but waited further communication from Fleitmann, did they?  A. That is my understanding."

After Hanna's visit to Starkville on April 16, 1902, the whole business between Fleitmann & Co. and John M. Stone Cotton Mills was conducted by correspondence, and Fleitmann & Co. were no parties to any of the subsequent proceedings by the mill.

Mr. Hanna was in Starkville only a few hours on April 16, 1902, during which time he had his talk to the board of directors and with different members of the board after the meeting was closed, and then, in company with Mr. Whittam, Mr. Page, and Mr. Scales, was driven out to the piece of property on the edge of town, which they informed him they were going to select for the site of the mill, and he was so rushed to make the Illinois Central train that he had difficulty in getting written the letter that was requested of him.  He returned to New York, and 12 days after the day at Starkville he persuaded Fleitmann & Co. to send a letter which he dictated to the president of the Mills, as follows:

"New York, April 28th, 1902.

"Mr. Arthur Whittam, Pres't., Starkville, Miss.

"Dear Sir:  We agree to take up to fifteen thousand dollars stock in your proposed mill, with the understanding that you are to place as much of this stock with your own people as you possibly can, thus relieving us of taking the full amount unless necessary.

"It is understood that we are to act as selling agents for your entire product.

"This proposition is submitted with the understanding that you now have, as stated, eighty-five thousand dollars already subscribed and that we are not to make any payments on our subscription until the mill is built, equipped and in operation.

"Yours very truly,                    [Signed] Fleitmann & Co."

This letter was never answered. On June 30, 1902, Fleitmann & Co. signed a paper appointing Mr. Whittam proxy to act for Fleitmann & Co. at stockholders' meetings. This proxy had been sent by Mr. Whittam to Dickson & Hanna. By means of the proxy Mr. Whittam voted 150 shares at the annual stockholders' meeting in July. The next communication between the parties was a letter sent by Fleitmann & Co. on September 16, 1902, inclosing a formal contract of subscription and agency, dated September 18, 1902. This contract was returned signed in the name of the corporation by its president on February 17, 1903. After some correspondence and investigation in relation to the condition of the Mills, Fleitmann & Co. paid $15,000 for 150 shares of stock on April 17, 1903. The contract provided that the Mills might terminate the agency on notice and paying par value for any stock held by Fleitmann & Co. Meanwhile the mill had been completed and the selling agency went into effect. The agency continued with mutual satisfaction until about the 1st of April, 1905. On March 31, 1905, the Mills wrote to Fleitmann repudiating the contract of September 18, 1902. Fleitmann & Co. then had some goods on hand, which were sold early in April at a price agreeable to the Mills. On April 1st the Mills wrote that they would not ship goods until they were sold. The appellants considered that this was contrary to the established custom and the best interests of selling. On April 5th a telegram came to the appellants signed "W. W. Scales & Company," asking Fleitmann to discount a draft attached to a bill of lading. A letter came from the Mills dated April 8th, demanding discount. On the 10th of April, 1905, the directors of the Mills declared the agency unsatisfactory, and on the 15th this was communicated to Fleitmann & Co. The appellants objected to the form of signature, "W. W. Scales & Company," and to the new method of selling and to the newly discovered practice of the Mills in pledging the finished product to the local bank, of which Mr. Scales was president. Efforts were made by the appellants for a friendly settlement, but proved unavailable. No more goods were consigned.

Defendants pleaded in answer to the original bill that Mr. Whittam concealed the contract of September 18, 1902, and signed it without authority, and that it was not discovered until 1905. It is shown by the proof that W. O. Page, who was a director and active vice president, and W. W. Scales, Jr., who was a director and secretary and treasurer of the Mills, knew of the contract when it was first received. And it appears that it must have been discussed at a meeting of the board of directors in 1903 when section 10 of the by-laws, relating to the power of the president, was amended by striking out the words, "And make all contracts for the company," and inserting the words, "Sign all contracts necessary for the operation of the plant." Mr.

Whittam gave up his presidency of the Mills early in 1905, and Mr. Scales, Sr., became head of the corporation.

The decree below was rendered without opinion. It dismisses the original bill, and grants the relief demanded in the cross-bill. In both these respects appellants allege the decree to be erroneous.

When Mr. Hanna met the board of directors of the Cotton Mills on April 16th, he did not hold himself out as the authorized representative of the complainants, and he was not in fact authorized, and the directors of the Cotton Mills did not, at the time, treat him as authorized. He did not sign the name of Fleitmann & Co. Just before going to Starkville to attend the meeting, he used the name of his own firm, Dickson & Hanna, in his correspondence with Mr. Whittam, the president pro tem. of the Cotton Mills. Mr. Whittam had had no correspondence with Fleitmann & Co. up to that time. The appellants had no correspondence with Mr. Hanna while he was on this trip south. He was not sent to Starkville by them. The most that the board of directors did or could have done by adopting a motion to approve of Mr. Hanna's "interesting talk" was to express their willingness to give the appellants the contract to handle the whole output of their mill on such terms as the appellants and the Cotton Mills could agree upon. When Mr. Hanna reduced his talk to a letter form, it was not received then or afterwards as a proposition which they were willing to accept. Therefore, in any view we can take of the proof, there was no binding subscription made or accepted on the 16th of April, 1902.

We have seen that 12 days after his day at Starkville Mr. Hanna persuaded Fleitmann & Co. to send a letter, which he dictated, to the president of the Mills. Counsel for appellee in propounding leading questions to their witnesses have referred to this letter as a contract and as a confirmatory letter, and have got to their questions the suggested answer to the propositions they have embodied in their questions, and then, in their argument, they have assumed that their questions and these answers established their contention that the letter was a contract and a confirmatory letter. To correctly find its true meaning, we must consider the intent of the party in sending it as expressed in the letter itself. It is the first track of Fleitmann & Co. towards establishing any relations with the appellee contemplating a definite contract. It was not sent as an acceptance or confirmation or ratification of any proposition, for there is no testimony that any proposition had been made from the Mills to Fleitmann & Co., nor is there any testimony that Fleitmann & Co. had any knowledge or belief that Hanna had assumed on their behalf to subscribe for or to take any stock in the Cotton Mills. He had, in fact, not done so. And there was no call on them for a confirmatory letter further than to have them do what Hanna was requested to do in their name, but declined to do for want of authority, namely, to make a proposition to the Mills. This it seems that Hanna succeeded in inducing them to do in substantially the exact terms of Hanna's letter of April 16th, omitting the provision as to the presidency of the enterprise. This letter of April 28th not only uses the language, "This proposition is submitted," etc., but the whole of the letter shows on its face that it was not sent as

an acceptance of or confirmation or ratification of any past proposition, but was merely to indicate a disposition on their part to take stock, and that it contemplated an agreement to be consummated later. It is obvious to any one on reading the letter that their main object was to acquire the agency, and, if there is any doubt as to this appearing on the face of the letter, the extraneous evidence, which the record offers on this point, fully removes that doubt. The letter does not specify definitely the amount of stock it was proposed to take. It is as clear from the letter as it is from all the proof in the case that Fleitmann & Co. did not desire to take or hold stock in the Cotton Mills as an investment, or for any other purpose than, in an emergency, to enable the Mills to produce output to be sent to Fleitmann & Co. for sale. That is, their evident object all along was to get the handling of the goods. And it was equally evident all along that the Cotton Mills preferred to have its stock taken at home. The contemplated transaction was serious enough to call for definite terms as to the mutual obligations of the parties to the sales agency contract. This letter was received by the president of the appellee in the due course of mail. Its receipt was well known at the time to the managing officers and directors of the corporation. No reply to it was sent to Fleitmann & Co., and the record not only does not show that there was any action of the board on it, but, to the contrary, does show that there was none.

On April 24th the board provided for the employment of a superintendent to take charge of the building of the mill, and made other provisions for the installation of the plant. At that time over $23,000 on the stock had been paid in. Active work on the plant then began and continued to completion. Fleitmann & Co. were not to make any payments "until the mill is built, equipped, and in operation." They had nothing to do as sales agents until the mill was ready to consign product. At the expiration of about five months Fleitmann & Co. sent to the Mills the following letter:

"Fleitmann & Co., 484–494 Broome Street, New York.

"Sept. 16, 1902.

"The John M. Stone Cotton Mills, Starkville, Miss.

"Gentlemen: Having looked over our different Cotton Mill contracts we find that we are not in possession of one with yourselves and we therefore ask you to kindly sign the enclosed, for our mutual guidance, at your earliest convenience.

"Yours very truly,      [Signed]  Fleitmann & Co.

"H. C. Fleitmann.

"P. S.  Kindly sign the carbon copy; the original is for yourselves."

The contract referred to in this letter is as follows:

"The following agreement made this day Sept. 18, 1902, between Messrs. Fleitmann & Company. New York City, and the John M. Stone Cotton Mills, Starkville, Miss., as follows:

"In consideration of the fact of Messrs. Fleitmann & Co., having agreed to purchase 150 shares of the common stock of the John M. Stone Cotton Mill, the said John M. Stone Cotton Mill agrees to make Messrs. Fleitmann & Co., Department Dickson & Hanna, its sole and exclusive selling agents.

"Messrs. Fleitmann & Co., on their part agree to guarantee all sales and insure goods of said John M. Stone Cotton Mill held by them in New York.

"The John M. Stone Cotton Mill agrees on its part to consign to Messrs. Fleitmann & Co., its entire product to be sold for its account, less commis-

sion of four per cent. (4%), and agrees to guarantee Messrs. Fleitmann & Co. against any loss arising from any claims that may be made on account of the goods produced by it—by reason of imperfections in said goods, late delivery of same or that goods delivered are not up to standard, etc.; and further, also, that cloth held at the John M. Stone Cotton Mill awaiting sales or shipping instructions, and also cloth that may have been advanced on, shall be covered by insurance; the policies to be made in the name of Messrs. Fleitmann & Co., and said John M. Stone Mill paying the premium.

"It is further mutually understood and agreed that should the said John M. Stone Cotton Mill decide to discontinue this contract, it may do so upon sixty days' notice to Messrs. Fleitmann & Co., and upon paying the par value for any shares of stock in the said John M. Stone Cotton Mill held by Messrs. Fleitmann & Co.

John M. Stone Cotton Mills,
"By Arthur Whittam, President."

The letter in which this contract was inclosed, addressed to the corporation and dated September 16th, arrived in the due course of mail, and was received at the office of the Mills by the president, in the presence of the vice president and of the secretary and treasurer. Their attention was called to the contract and the secretary and treasurer read it, and a conversation between the president and these other officers, both of whom were directors, was then and there had, during which conversation the contract or the opened envelope containing it was lying on the table between the president's desk and the secretary's desk, in the presence of the vice president. At the close of this conversation, while the vice president was still present, the contract was placed in a pigeon-hole in a desk belonging to the Mills and used by the president, where it seems to have remained until the change in the presidency of the corporation.

On February 17, 1903, this letter was sent to:

"Messrs. Fleitmann & Co., 484-494 Broome St., New York, N. Y.

"Dear Sirs: Enclosed herewith we hand you signed contract as requested in your letter of September 16th, '02. (Carbon Copy.)

"We regret the delay in returning same but the matter has been unintentionally overlooked by us.

"Our mill is now in operation and we shall be glad to have you favor us with a remittance as per contract at your earliest convenience.

"Trusting you will find it convenient to do so and awaiting your further favors, we are,

"Yours very truly,                              John M. Stone Cotton Mills.
"By Arthur Whittam, President."

The appellee refused to recognize this contract, chiefly on three grounds: First, that it is ultra vires; second, that it was fraudulent as to creditors; and, third, that it was signed by the president without authority. In the pleadings there are also direct charges of fraud.

From a business standpoint, this contract is a very natural one for the parties to have made. Fleitmann & Co. wished the agency of the Mills, and the Mills needed the use of Fleitmann & Co.'s money. The terms of the agency offered are advantageous to the Mills. The sales are guaranteed by a factor of unquestioned standing, and the Mills need fear no losses. It is said the Mills are paying lower commissions now than 4 per cent., but it is not shown who takes the risk of the sales or what standing the sales agent has. It is shown that the commission named in the contract was the usual one. Fleitmann & Co.'s interest in the Mills does not extend beyond the agency, hence

the provision for repurchase in case the agency is terminated. Had this provision been omitted, the Mills, perhaps, could not have terminated the agency without being liable for damages for the breach, which might well have been serious. By exercising the option the Mills would not lose $15,000. They would regain the stock as treasury stock and might gain by it, if the stock were above par. There is no arbitrary favor to Fleitmann & Co. The option is in the Mills. It is as if the provision had been that the Mills might terminate the contract on 60 days' notice and on payment of $5,000 or other sum. as liquidated damages.

[1] From the view of the. testimony we have taken it seems clear that the first of the grounds which the appellee chiefly urges is not applicable to this case. We find nothing in the Constitution of the state of Mississippi or in the statute provisions of that state relating to corporations or in the charter of the appellee which forbids or limits the power of the appellee to contract as it did with the appellants. As to the second ground upon which the appellee relies, that it was fraudulent as to creditors, there is no evidence that there were any creditors at the time this contract was made, and there is certainly no appearance for creditors in this case. [2, 3] As to the third ground, that it was signed by the president without authority, that is expressly answered by the provisions of the by-laws in force at the time the contract was made. The charges of fraud which are made. by the appellee in its pleadings are not sustained by any evidence as we view the testimony and the written evidence embraced in the record. The witnesses who testified for the appellee did include in their answers the arguments and inferences and conclusions of fact and conclusions of law embraced in the direct interrogatories and questions of the distinguished and able counsel who appeared for the appellee, but there is we think substantially no dispute as to the actual facts which existed in the negotiations of the parties which led up to the concurrence of minds expressed in the contract bearing date September 18, 1902. We have examined the references to text-books and to the very numerous decisions of other courts made by industrious and able counsel as far as these authorities have been accessible to us, and without the profitless labor of giving a specific review of the same in this opinion we have endeavored to apply the sound doctrine which they illustrate to the facts of the case before us for decision.

Judge Thompson in the preface to his Commentaries on the Law of Corporations, dated January 1, 1895, says:

"The author finds his justification for the publication of so large a work upon a single title of the law * * * in the fact that upon no subject in that law has this growth been as rapid and as rank as upon the subject here under consideration. The statement of a single fact made by Mr. Justice Field in his oration delivered at the Centennial Celebration of the Supreme Court of the United States in the city of New York in 1890 that four-fifths of the wealth of the country is held by corporations will give emphasis to what is here said. * * * This work was commenced more than 16 years ago. * * * Since its commencement great changes have taken place in the American law of private corporations. The American doctrine that the capital stock of a corporation, including its unpaid share subscriptions, is a trust fund for its creditors has during that period been greatly

modified—so much so that it may now be doubted whether the capital of a corporation is a trust fund for its creditors in any different sense than the sense in which the property of a private person is a trust fund for his creditors. The doctrine formerly held by many of the state courts and emphasized by a decision of the Supreme Court of the United States and still firmly insisted upon in England that the shares of a corporation can be sold and distributed only at full value either in money or in property has been greatly shaken, if not overthrown, by recent decisions of the Supreme Court of the United States."

We cite in the margin only a few of the comparatively recent cases which appear to us most nearly analogous to the case at bar: Walter L. Chapman v. Ironclad Rheostat Co., 62 N. J. Law, 497, 41 Atl. 690; Egbert v. Sun Co. (C. C.) 126 Fed. 568; Edgar Leonard v. Edward F. Draper et al., 187 Mass. 536, 73 N. E. 644; Watts Mercantile Co. v. Buchanan et al., 92 Miss. 540, 46 South. 66; Paul Steam System Co. v. Paul (C. C.) 129 Fed. 757; Daponte v. Breton et al., 121 La. 454, 46 South. 571. Further, if, as appellee contends, the contract was invalid, either for want of power in the corporation to so contract, or for want of authority in the president to make the contract for the corporation, the appellee would not be allowed after all that took place from the making of the contract to the repudiation of it to refuse to refund the appellant's money with proper interest.

We conclude that the decree of the Circuit Court must be reversed, and this court must now decree that the appellee is required to purchase and receive delivery and surrender of the certificates of stock held by the appellants and tendered in their bill, and pay to the appellants the sum of $12,468.95, with interest thereon at the rate of 6 per cent. per annum from April 8, 1905, the sum of $2,531.05, which the appellee by its cross-bill seeks to recover, being deducted as of the date of its receipt by the appellants from the $15,000 which the appellants were entitled to receive for the stock surrendered, and that the cross-bill be dismissed, the appellee to pay all the cost incurred in the Circuit Court and in this court.

It is so decreed.

SHELBY, Circuit Judge, dissents.