## SAVAGE et al. v. MONARCH ROYALTY CORPORATION et al.
### No. 726.

Circuit Court of Appeals, Tenth Circuit.
April 6, 1933.

· Edward J. Fleming, of Tulsa, Okl. (H. C. Doyle and E. R. Meyer, both of Kansas City, Mo., on the brief), for appellants.

Villard Martin, of Tulsa, Okl. (Geo. S. Ramsey, Edgar A. deMeules, and Garrett Logan, all of Tulsa, Okl., on the brief), for appellees.

Before COTTERAL and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The appellant filed his claim for $37,716.60 with the Receiver of the Monarch Royalty Corporation. The Receiver protested its allowance on the ground that the claim

was founded on a scheme to defraud the stockholders of the corporation, was ultra vires and contrary to public policy. The issues were referred to a master who made a report which includes a summary of the testimony, a running comment thereon, some observations on the applicable law, two short conclusions of fact, and a conclusion of law that the claim should be disallowed. To this report exceptions were filed in most general terms. They are that the findings "are against the substantial weight of the evidence"; "unsupported by any evidence"; "the Special Master erred in the conclusions of law," and his recommendations are "against the law and the evidence." The trial court denied the exceptions, confirmed the report, and entered judgment against the claimant.

These exceptions are not sufficient to challenge any part of the report. No proper exceptions having been filed, Equity Rule 66 (28 USCA § 723) directs that the report shall stand confirmed. The practice of referring causes or issues to a master is a device to conserve the time of the court. The master hears the evidence, sifts the wheat from the chaff, and then reports the facts as he finds them to the court, with or without his conclusions of law or recommendations as to a decree, as he may be directed. The duty then devolves upon the dissatisfied party to point out specifically the facts found by the master which he asserts are not in accord with the evidence, or the error in the conclusion of law. The court's task is then narrowed to an examination of so much only of the record as bears upon the specific exception. Nothing of the kind was done here. A general challenge was made to all of the report; yet much of the report deals with facts that are not in dispute. Neither the trial court, nor this court, can pass on these exceptions without a line-by-line study of the entire proceedings before the master. Such exceptions undo all the benefit which is supposed to be derived from the expense of a reference. The law has long been settled that such general exceptions are unavailing. In Sheffield, etc., Ry. Co. v. Gordon, 151 U. S. 285, 14 S. Ct. 343, 38 L. Ed. 164, the matter is elaborately discussed and the earlier cases cited. Later cases may be found in Thomson Mach. Co. v. Sternberg (D. C.) 55 F.(2d) 715; Sandford v. Embry (C. C. A. 6) 151 F. 977; and Foster's Fed. Pr. (6th Ed.) p. 1927. That the master's report did not separately set out the facts found with precision and certainty does not justify a further violation of the rules governing a reference; the remedy is by a request to the master to comply with his duties, or a motion to the court to re-commit for that purpose.

In Sheffield, etc., Ry. Co. v. Gordon, supra, the Supreme Court states that if the report of the master is clearly erroneous, the court may, in its discretion, correct the error. We have therefore examined the evidence, and have come to the conclusion that there is no occasion to disturb the conclusion of the master and the trial court. The record leaves no clear trail of just what went on in the large scale operations between Currier, the President of the corporation, and appellant, a stockbroker, except that Currier, for the corporation, was playing the market on the corporation's stock; and that most, if not all, of appellant's claim is to recover profits on the drop in the market.

The first claim of appellant is for $22,950, which appellant states arose in this wise: Prior to March 31, 1930, Currier sent to Savage a block of Monarch stock to be sold, the amount of which is not disclosed by the record. Savage sold this stock for 66¢ a share and remitted 60¢ a share. Currier then came to New York, bringing with him another block of stock of an unknown amount. The stock theretofore sold, and the stock brought to New York, together amounted to 60,000 shares. Savage sold the stock brought to him for 66¢ a share, all of which was remitted to the company. It is thus seen that Savage sold 60,000 shares at 66¢ a share and paid the company 60¢ a share for part of it, and 66¢ a share for the balance. He lost no money in the transaction. His claim is predicated on a letter Currier wrote him on March 31, 1930, which refers to the entire 60,000 shares, and says in part:

"This stock is loaned to you with the positive understanding that this stock must be returned to us on or before August 15th, 1930, at which time we will return to you your 66 cents per share deposited against this loaned stock. This constitutes an agreement between Monarch Royalty Corporation and James A. Savage & Company as evidenced by the signatures below."

It will be observed that this letter purports to apply not only to the stock delivered about that time, but to an unknown amount of stock which had been sent to Savage and sold by him prior to the date the letter was written. Savage also testifies that Currier authorized him to sell the balance of the stock promptly after receipt of the letter, which he did. It is, therefore, a misnomer to speak of the transaction as a "loan." Savage sold

the stock and accounted to the corporation for the net proceeds; the balance of the agreement is nothing but a wager as to the quoted price of the stock on a day some months in the future. If the market went up in the succeeding four months, the corporation won; if it went down, it lost. By August 15th the market had dropped from 66¢ to 26¢ a share. Savage did not buy or tender the stock in August; he simply charged the corporation with the drop in the curb quotations of the stock, and now seeks to recover it.

There is no occasion for any close scrutiny into the powers of the corporation, or Currier's power as President; nor to enter into the troublesome question of when a corporation may sell its stock with an agreement to repurchase it. Allen v. Commercial Nat. Bank (C. C. A. 6) 191 F. 97; Fleitmann v. John M. Stone Cotton Mills (C. C. A. 5) 186 F. 466. This record presents no case of a bona fide contract to repurchase from a stockholder if he becomes dissatisfied; Savage expected to and did promptly sell this stock without conditions attached; Savage did not return, nor expect to return, the stock sold or loaned to him. The agreement concerns itself with the quoted price of a listed stock on a specific date in the future. Although an effort is made to camouflage the transaction, in essence it is but a wagering contract to which Currier could not obligate his stockholders. The corporation was not organized to play the stock market, and Currier was not authorized to gamble on the market with the moneys of his stockholders.

The second claim arose in this manner, according to the testimony of Mr. Savage: Some time "possibly in the month of June, 1930," Mr. Currier asked Mr. Savage to advance some money for pressing corporate needs on 130,000 shares of treasury stock. After part of the advancements had been made, Mr. Savage testified "the market was falling and falling rapidly, and we [Currier and Savage] decided it was time to have some contract regarding the 130,000 shares. * * * It was a dangerous situation to touch at that time." Because of the rapidly falling market, and to protect appellant from the danger attendant upon his situation, Mr. Currier, purporting to act for the corporation, gave Mr. Savage a letter, the important part of which is:

"I want to thank you in behalf of the Monarch Royalty Corporation for assisting the corporation by advancing monies on the 130,000 shares. * * * We are going on the curb and I will protect you; that is, the corporation will, but I agree immediately to put some money behind this market to protect you pending our listing. The corporation will have plenty of money from oil runs which will now be released and that money will be available to repurchase some of this stock back from you, anyway the corporation is to have one-half of everything over 50 cents per share on the stock."

Mr. Savage testified he advanced $57,000 on these 130,000 shares, or a little less than 44¢ per share. Mr. Savage testified he did not purchase this stock; if he did not, his advancements were a loan. The interest on the loan contracted for in this letter is all the profit realized by a sale up to 50¢ a share, and one-half the profit over that. There is evidence that it was not a loan; if it was a loan, the record is silent as to its maturity; again, in a letter written August 14, 1930, Mr. Savage says "you offered and sold us street certificates in the amount of some 130,000 shares." In a statement sent the corporation, Mr. Savage does not ask for the return of moneys advanced. The statement reads "Loss on block of 130,000 shares by reason of violation of agreement to support market." In his letter to the receiver, he describes the 130,000 shares as "purchased under agreement from Monarch Royalty Corporation." In his formal proof of claim in this case, he characterizes his two claims as follows:

"Loan, $39,600, Mch. 31, 1930.
"Loss on $21,965 on securities."

The last item involves the 130,000 shares of stock which he now testifies was a loan. It will therefore be seen that there is ample proof in the record to treat this transaction as a sale of stock to Savage, with an agreement that the corporation would stand all losses, and receive something less than half the profits, arising from the sale of this stock, with no limit as to time. This item therefore has the same vice as the other one—a market speculation with corporate funds—aggravated by the fact that the stockholders did not get a fair run for their money when their President generously offered to stand all the losses if Mr. Savage would account to him for less than half the profits.

Officers of corporations have no power to embark corporate assets in an attempt to beat the stock market. Their business is to carry on the business for which the corporation was formed. If there is money to be made or lost in speculating in the corporate stock, it is not a corporate function. Everything else to one side, it is entirely apparent

that these operations were nothing more nor less than speculations on the stock market, which both parties knew were entirely out-side of the powers of this corporation and its President.

Moreover, the proof does not satisfactorily sustain the claim. Savage admits having received $35,035 for these 130,000 shares which he sold, despite the fact he testified he only "advanced" money on them. He also received $7,798.40 on account from the corporation before the receivership. He received therefore, $42,833.40. He testified he advanced $57,000, but is not able to support that statement with proof one would expect to find in such a transaction. He says he advanced $22,000 before the contract was made, but no check or draft is in the record. He says he paid $35,000 after June 19th on the verbal instructions of Currier, and produced a list of such payments. But they total only $15,050, of which $3,650 was paid to Currier in cash, $2,000 was paid to an attorney in Los Angeles, and only $6,000 paid to the corporation. But even if all the sums which Savage has any record of paying out are charged to the corporation, and if to that is added the $22,000 which he claims to have paid before June 19th, then he paid out $35,050, and has received in return $42,833.40.

It is strange that a stockbroker, seeking to recover $57,000 advanced, cannot support his claim with canceled checks to the penny. It is strange that his own detailed statement of advances is nearly $20,000 shy of the amount he sues for. His present claim is for $21,965. Yet in a letter dated August 14, 1930, he states he "took a loss of approximately $15,000."

The record leaves the question of how much money was advanced in as murky a condition as it leaves the question of what the transaction actually was. Under such circumstances, we readily arrive at the conclusion that the judgment of the trial court should not be disturbed.

Affirmed.